**NOTICE:   SLIP OPINION**
**(not the court's final written decision)**

The opinion that begins on the next page is a slip opinion.  Slip opinions are the written opinions that are originally filed by the court.

A slip opinion is not necessarily the court's final written decision.  Slip opinions can be changed by subsequent court orders.  For example, a court may issue an order making substantive changes to a slip opinion or publishing for precedential purposes a previously "unpublished" opinion.  Additionally, nonsubstantive edits (for style, grammar, citation, format, punctuation, etc.) are made before the opinions that have precedential value are published in the official reports of court decisions: the Washington Reports 2d and the Washington Appellate Reports.  An opinion in the official reports replaces the slip opinion as the official opinion of the court.

**The slip opinion that begins on the next page is for a published opinion, and it has since been revised for publication in the printed official reports.**  The official text of the court's opinion is found in the advance sheets and the bound volumes of the official reports.  Also, an electronic version (intended to mirror the language found in the official reports) of the revised opinion can be found, free of charge, at this website: https://www.lexisnexis.com/clients/wareports.

For more information about precedential (published) opinions, nonprecedential (unpublished) opinions, slip opinions, and the official reports, see https://www.courts.wa.gov/opinions and the information that is linked there.

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

**IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON**

| | |
|---|---|
| THE STATE OF WASHINGTON, | No. 83386-3-I |
| Respondent, | DIVISION ONE |
| v. | PUBLISHED OPINION |
| BROGAN R. BARTCH, | |
| Appellant. | |

BIRK, J. — Brogan Bartch appeals a conviction for indecent liberties, based on a charge that he had sexual contact with S.P. while she was incapable of consent. We agree with Bartch that the trial court erred by (1) admitting evidence that Bartch had made prior sexual advances toward S.P., (2) excluding under the rape shield statute evidence offered to show dishonesty by S.P., and (3) excluding prior inconsistent statements by a government witness. The first error requires reversal, and we reach the latter two because of their likelihood of arising in the event of retrial. We reverse Bartch's conviction and remand.

I

In 2018, S.P. and Bartch were among a group that socialized together several times during the summer. S.P. and Bartch privately communicated "every now and then" during this period, through Snapchat.[1] On one occasion, S.P. sent

---

[1] "Snapchat" is a social media application allowing users to send messages or images to other users. The messages automatically disappear a few seconds

Bartch a Snapchat of herself sunbathing in a swimsuit with a message asking if he was still with a mutual friend, with the intent of making plans for the evening. On June 26, 2018, S.P. attended a gathering at Bartch's house with Bartch, James McCool, and Ashlyn Johnson.

After arriving, S.P. and Johnson[2] began drinking vodka. Testimony varied about the amount of alcohol S.P. drank and the extent of her intoxication. S.P. testified she did not remember how much she drank, but she remembered that she had estimated in her interview with detectives that she had consumed five to seven shots of liquor.

Johnson testified she observed Bartch touching S.P.'s back and generally being near S.P. Bartch testified that after the drinking game ended he sat on a workout bench next to the table they had been playing at, S.P. straddled the bench facing him, she scratched his back under his shirt, and they kissed. He testified she consented to going to bed with him later. S.P. testified she had no memory of these events.

Johnson testified she and Bartch guided S.P. to Bartch's bedroom to go to sleep, where S.P. "passed out almost immediately." Johnson testified she and Bartch left the room. Johnson and Bartch began talking and Bartch initiated kissing, but stopped after Johnson told Bartch she was uncomfortable. Bartch brought Johnson sweatpants and, according to Johnson, instructed her to change

---

after the recipient opens the message. The messages can be preserved if the recipient takes a screenshot of the message or image.

[2] For clarity, we refer to Ashlyn Johnson by her last name, and her sister, Breanna Johnson, by her full name. We intend no disrespect.

2

in front of him. After this, Johnson testified, Bartch "said he was going to go get water," but instead "ran into his room," where S.P. was sleeping.

Bartch testified that, when he entered his room, S.P. was sitting up in his bed and consented to him joining her, and she opened up the covers for him to do so. They engaged in consensual, mutual kissing and touching for several minutes. According to Bartch, S.P. had helped him remove some of her clothes, but Johnson started knocking on the door. Bartch said he and S.P. talked about letting Johnson in, then he unlocked the door and left the room so Johnson could talk to S.P.

Bartch said S.P. departed with Johnson with greater capacity than Johnson credited. His brother Bridger Bartch likewise testified that when she left, S.P. was not in distress. Instead, she was awake and appeared to be interacting about the same as she had earlier in the evening, when he had no concerns about her level of intoxication.

S.P. testified she did not remember how she got from the couch to the bedroom. She testified she remembered hearing the lock click and hearing Bartch's voice close to her. S.P. recalled being in and out of consciousness, and hearing banging on the door. She could not remember Bartch touching her or kissing her.

Johnson testified that, as soon as she saw Bartch go to his bedroom and lock the door, she began pounding on the door and screaming, calling out to S.P. One of Bartch's brothers came downstairs and attempted to open the door. Bartch unlocked and opened the door.

3

Johnson testified S.P. was naked from the waist down and nonresponsive. Johnson testified S.P. said, " 'Something's wrong.' " Johnson asked, " 'Did he rape you?' " S.P. responded, " 'He raped me' " and " 'I want to die.' "

Johnson called her sister, Breanna Johnson, who picked her and S.P. up. Breanna Johnson testified she arrived at Bartch's house at approximately 3:30 a.m. Johnson and Breanna Johnson took S.P. to the police station. Initially they drove to a police station in Monroe. Afterwards, they drove to the Kirkland Police Department. A Kirkland police detective testified he was dispatched at 4:43 a.m. to meet them in the lobby of the Kirkland police station. S.P. and Johnson provided statements to the Kirkland police the morning of June 27, 2018.

On May 8, 2019, the State charged Bartch with one count of indecent liberties. This required the State to prove that S.P. was "incapable of consent by reason of being mentally incapacitated and physically helpless." Bartch argued S.P. consented to sexual contact both through flirtatious behavior leading up to the sexual contact in the bedroom, and by expressly consenting. Further, Bartch argued he reasonably believed S.P. was capable of consenting. The jury returned a guilty verdict. Bartch appeals.[3]

II

The State offered evidence of two prior instances in which Bartch made sexual advances towards S.P. First, the State put on evidence that S.P. previously

---

[3] The State filed a notice of cross appeal "of the issues arising from the judgement [sic] and sentence entered in this case as well as the trial court's Order of Release finding RCW 10.64.025(2) unconstitutional." However, the State did not assign error to any decision of the trial court in its briefing or otherwise perfect its cross appeal, so its cross appeal has been abandoned.

No. 83386-3-I/5

attended a party at Bartch's residence. In cross-examination apparently directed to the events of that night, S.P. identified it as occurring in the summer of 2017. S.P. needed to get something from her car. Bartch accompanied her. When S.P. bent over to reach into her car, Bartch slapped her twice on the backside. The two of them walked back to Bartch's house, and he asked S.P. if he could perform oral sex on her on the porch. S.P. said no. S.P. testified she was not interested in Bartch, and it seemed to her he was "begging" for sex. Second, later the same night, when the party was "toning down," Bartch asked S.P. if she wanted to "sleep with him." S.P. again declined.

The trial court admitted evidence of these other acts under Washington's "lustful disposition" case law. Generally, ER 404(b) prohibits evidence of "other crimes, wrongs, or acts" to prove the character of a person to show the person acted in conformity with that character, that is, propensity. State v. Gresham, 173 Wn.2d 405, 420, 269 P.3d 207 (2012). But the rule permits evidence of other acts for purposes other than propensity. ER 404(b). Historically one such purpose was to show "lustful disposition" towards a specific person in sexual assault cases. Washington decisions had permitted evidence of other acts by the defendant toward the same victim "to demonstrate 'the lustful inclination of the defendant toward the [victim], which in turn makes it more probable that the defendant committed the offense charged' because it 'evidences a sexual desire for the particular [victim].' " State v. Crossguns, 199 Wn.2d 282, 291, 505 P.3d 529 (2022) (alterations in original) (quoting State v. Thorne, 43 Wn.2d 47, 60, 260 P.2d 331 (1953), abrogated by Crossguns). Lustful disposition was the only purpose the

5

State identified supporting admission of Bartch's prior advances, and the only purpose relied on by the trial court in allowing the evidence.

After trial in this matter, Crossguns held that the term " 'lustful disposition' must be rejected and that it may no longer be cited as a distinct purpose for admitting evidence under ER 404(b)." 199 Wn.2d at 290. The court explained the "term 'lustful disposition' perpetuates outdated rape myths that sexual assault . . . results from an uncontrollable sexual urge or a sexual need that is not met," instead of acknowledging such a crime as an act of violence "that uses unwanted sexual contact as the weapon." Id. at 291. The court held that if a trial court admits other acts, even "in part, under the anachronistic term of 'lustful disposition,' " it commits error. Id. at 296.

Crossguns mandates a conclusion of error here. We review evidentiary rulings for an abuse of discretion. State v. Fisher, 165 Wn.2d 727, 745, 202 P.3d 937 (2009). "There is an abuse of discretion when the trial court's decision is manifestly unreasonable or based upon untenable grounds or reasons." State v. Brown, 132 Wn.2d 529, 572, 940 P.2d 546 (1997). A trial court necessarily abuses its discretion if the ruling is based on erroneous interpretation of the law. State v. Gaines, 16 Wn. App. 2d 52, 57, 479 P.3d 735 (2021). Because the trial court allowed the evidence based on an interpretation of the law that Crossguns has since abrogated, admitting the evidence was an abuse of discretion.

Despite Crossguns's abrogation of the lustful disposition doctrine, the State argues the evidence here was "properly admitted for other, permissible purposes." Crossguns, 199 Wn.2d at 296. We may consider "other proper bases on which

6

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

the trial court's admission of evidence may be sustained." State v. Powell, 126 Wn.2d 244, 259, 893 P.2d 615 (1995). In holding the term "lustful disposition" no longer serves as a distinct purpose for admitting evidence under ER 404(b), Crossguns did not "disturb our precedent" permitting evidence of "collateral misconduct relating to a specific victim for appropriate purposes" under the rule. 199 Wn.2d at 290. In Crossguns, appropriate purposes were evident. The State charged Crossguns with second degree rape of a child and second degree child molestation of his minor daughter R.G.M., with aggravators of using a position of trust and an ongoing pattern of sexual abuse of the same victim. Id. at 286. The State offered evidence Crossguns had regularly abused R.G.M. starting months before the charged acts, "as often as every other night." Id. at 287. "[E]vidence of prior sexual misconduct may be relevant and admissible in cases . . . that involve sexual abuse in the context of a relationship with unequal power dynamics." Id. at 295. The trial court had erroneously relied on lustful disposition to admit evidence of the other acts, id. at 287, but the appellate court affirmed because other ER 404(b) purposes were present, including the purposes listed in the rule, showing R.G.M.'s " 'state of mind for her delayed disclosure,' " and proving the charged aggravators, id. at 296.

The other, permissible purposes relied on in Crossguns are absent here. In that case involving a parent's abuse of his child, the charged sex crimes implicated the necessary components of access and control and developing trust necessary to the grooming process. 199 Wn.2d at 295. The present case does not involve a long-term pattern of control and abuse. The trial court's ER 404(b) analysis

instead shows there was no purpose other than lustful disposition. To admit prior misconduct under ER 404(b), a trial court must (1) find by a preponderance of the evidence that the misconduct occurred, (2) identify the purpose for which the evidence is sought to be introduced, (3) determine whether the evidence is relevant to prove an element of the crime charged, and (4) weigh the probative value against the prejudicial effect. State v. Ashley, 186 Wn.2d 32, 39, 375 P.3d 673 (2016). When applying the test in this case, the trial court identified only lustful disposition as the purpose for the evidence. Further undermining the State's position on appeal, the trial court never identified any element of the crime to which Bartch's prior advances were relevant. On this step of the test, the trial court stated only that the evidence was "of consequence, potentially. Well, it's relevant to the action." Finding generalized relevance "to the action" does not meaningfully apply the test, and underscores the absence of an other, permissible purpose.

In an attempt to establish an other, permissible purpose for the evidence for the first time on appeal, the State argues that Bartch's prior advances were "evidence of Bartch's sexual interest in S.P., a fact" the State claims is "relevant to a finding of 'sexual contact,' which is an element of indecent liberties." Further, the State argues that, since "[s]exual contact is defined as 'touching . . . for the purpose of gratifying sexual desire . . . ,' " this evidence provides "proof that the charged act was sexually motivated." In short, the State offers motive as the other, permissible purpose.

Asserting a need to prove motive "is not a 'magic [password] whose mere incantation will open wide the courtroom doors to whatever evidence may be

offered in [its name].' " State v. Wade, 98 Wn. App. 328, 334, 989 P.2d 576 (1999) (alterations in original) (quoting State v. Saltarelli, 98 Wn.2d 358, 364, 655 P.2d 697 (1982)). We should "refuse to allow [such] evidence . . . to be admitted without a careful consideration of [its] relevance." Saltarelli, 98 Wn.2d at 364-65. Bartch's prior advances were dissimilar to the charged conduct and remote in time. They are at most only minimally probative that the later conduct that was charged was for the purpose of gratifying sexual desire, and in the best case only cumulatively so. Especially considering the State offered the evidence only based on a purpose the Supreme Court has disavowed and that only ever amounted to impermissible propensity, the State's alternative theory of motive advanced on appeal fails to establish an other, permissible purpose under ER 404(b).

The State last argues that even if it was error to admit evidence of the other acts and there is not an alternative other, permissible purpose for which admissibility can be established, error in admitting the evidence was nevertheless harmless. The nonconstitutional harmless error standard asks whether " 'within reasonable probabilities, had the error not occurred, the outcome of the trial would have been materially affected.' " State v. Gunderson, 181 Wn.2d 916, 926, 337 P.3d 1090 (2014) (internal quotation marks omitted) (quoting State v. Gresham, 173 Wn.2d 405, 433, 269 P.3d 207 (2012)). The improper admission of evidence constitutes harmless error if the evidence is of minor significance in reference to the overall, overwhelming evidence as a whole. Nghiem v. State, 73 Wn. App. 405, 413, 869 P.2d 1086 (1994). We do not conclude the admission of the other acts evidence was harmless under this standard.

The State asked the jury to particularly rely on the other acts evidence in presenting its case. The State highlighted Bartch's prior advances by starting its opening statement with a description of them as the beginning of a continuous longing by Bartch ("begged") to have sex with S.P. and waiting until she was helpless. In closing, the State described S.P.'s incapacity as "[a]n opportunity that [Bartch] had been thinking about for a long time" and that, "as time [went] on, he felt he was entitled to sex he was owed." There was competing testimony as to how much alcohol S.P. consumed, when she stopped drinking, and S.P.'s mental state when she was in the bedroom with Bartch. The history and nature of the relationship between S.P. and Bartch therefore had a reasonable probability of being of particular significance to the jury. Because the other acts evidence was inadmissible for the purpose for which it was admitted, the State does not show an other, permissible purpose, and there is a reasonable probability the outcome may have been affected, we reverse Bartch's conviction.

III

Bartch further assigns error to the trial court's exclusion of evidence that S.P. made a false statement to the police about whether she consented to sexual contact with Bartch. Although we independently reverse under Crossguns, we reach this issue for two reasons. First, it is likely to arise in the event of retrial.[4]

---

[4] We appreciate the dissent's thoughtful analysis, but we respectfully disagree with its proposed approach towards the evidentiary issues presented by S.P.'s and Johnson's inconsistent statements. We do not agree that reaching evidentiary issues likely to arise in the event of retrial falls under the principle discussed in Washington State Farm Bureau Federation v. Gregoire that a reviewing court should decline to reach additional issues when one issue " 'disposes of a case.' " 162 Wn.2d 284, 307, 174 P.3d 1142 (2007) (internal

10

No. 83386-3-I/11

Second, because evidence of Bartch's prior sexual advances is inadmissible under

Crossguns, the focus of a retrial would be more particularly on the events of June

26-27, 2018. Because S.P.'s statement concerned her sexual history, the

evidence that it was false also concerned her sexual history. The trial court

improperly applied the rape shield statute to exclude the evidence. The rape shield

statute was not intended to bar evidence of a specific instance of dishonesty in the

circumstances present here, and so does not apply merely because the subject

matter of the dishonesty concerned the speaker's sexual history.

---

quotation marks omitted) (quoting Hayden v. Mut. of Enumclaw Ins. Co., 141 Wn.2d 55, 68, 1 P.3d 1167 (2000)). In Washington State Farm Bureau, the court held that certain taxes enacted in 2005 did not violate a statutory 2006 expenditure limit previously established by Initiative Measure 601. 162 Wn.2d at 289-90, 292. Rejecting the challenge to the revenue measures, the court remanded for entry of summary judgment in favor of the State. Id. at 307-08. The court's opinion disposed of the case in its entirety, and in that context it declined to reach other issues. Similarly, in Hayden, an insurance coverage case, the court affirmed summary judgment terminating the action. 141 Wn.2d at 57, 60, 67-68. In contrast, neither our opinion nor the dissent's view disposes of this case, but rather we remand for further proceedings. Reviewing courts may appropriately reach issues likely to arise in the event of retrial. E.g. In re Det. of Pouncy, 168 Wn.2d 382, 385-86, 229 P.3d 678 (2010) ("[W]e also address the impeachment evidence issue because it is one that is likely to arise on retrial."); State v. Dingman, 149 Wn. App. 648, 650 n.2, 202 P.3d 388 (2009) (reversing conviction because of discovery violation and reaching instructional and other error likely to arise in the event of retrial); State v. Peterson, 145 Wn. App. 672, 675-76, 186 P.3d 1179 (2008) (vacating conviction because of defective information and reaching the elements required to be proved in the event of retrial). The other cases cited by the dissent do not suggest otherwise. In State v. Spokane County District Court, 198 Wn.2d 1, 16-17, 491 P.3d 119 (2021), the court *did* reach additional issues because doing so would provide guidance in the event of retrial. And in State v. Orozco, 19 Wn. App. 2d 367, 369, 378 n.4, 496 P.3 1215 (2021), after reversing based on Batson v. Kentucky, 476 U.S. 79, 106 S. Ct. 1712, 90 L. Ed. 2d 69 (1986) and GR 37, the court *did not* reach an ineffective assistance claim based on the defendant's representation at the now-reversed trial, but *did* reach an issue concerning the scope of trial governed by international extradition law because it would arise in the event of retrial.

11

S.P. gave an interview with the police on the morning of June 27, 2018. While denying specific recall, S.P. stated that, after she went into Bartch's room, she was "pretty sure [she] went to sleep because . . . I have a boyfriend, so I would never try to, like, be with someone else." She made similar statements to a sexual assault nurse examiner. Bartch asserts these statements were false, and that S.P. had had sex with others while seeing the boyfriend she had at the time and in other relationships. In a later interview, the prosecutor asked S.P., "Do you think Lucas feels that—feels like you cheated on him?," and S.P. answered, "I mean, I know that he knows I did." S.P. confirmed she did "cheat" on him, stating, "I did, yes. I'm not going to lie." When asked to clarify her last sexual partner before "Lucas," S.P. stated, "I can't pinpoint it to one person. I mean, I was kind of just dating around." In the same interview, S.P. stated, "Lucas and I were kind of on and off, so I hooked—like, I had intercourse with A.J. at some point while I was dating Lucas." S.P. was not sure whether that was before or after the incident at Bartch's.

Bartch additionally relied on deoxyribonucleic acid (DNA) testing of S.P.'s underwear which indicated four contributors, possibly S.P. and three, or possibly four, others, from which Bartch and S.P.'s boyfriend were excluded. And Bartch indicated an intent to call witnesses who would testify that "later in the summer of 2018," S.P. had consensual sex with McCool, that S.P.'s boyfriend had "proof" she had had sex with another person while they were dating based on a phone call to her number answered by an unknown other person, and that S.P. had been seen to have sexual encounters with others and had "a reputation for being unfaithful to her boyfriends."

12

No. 83386-3-I/13

The trial court found some of the proffered evidence relevant to the extent the defense "is entitled to explore the veracity of the statements offered by . . . the alleged victim." However, the trial court found it had "to balance that against the potential prejudice to the victim. And the potential prejudice is high . . . . These are very personal issues and they have a high likelihood of inflaming the jury and distracting them and confusing them." The trial court called out in particular the testimony about S.P.'s "general reputation for cheating on her boyfriends [as] inflammatory, highly prejudicial, not reliable, and not admissible." The court called such testimony "a smear" and stated that it "seems to fall smack into what the rape shield statute [RCW 9A.44.020] and the policy behind it are designed to exclude."

We review a trial court's decision to admit or exclude evidence under the rape shield statute for abuse of discretion. State v. Aguirre, 168 Wn.2d 350, 363, 229 P.3d 669 (2010). However, the question whether the rape shield statute applies to particular evidence is a question of statutory interpretation. See State v. Jones, 168 Wn.2d 713, 722, 230 P.3d 576 (2010). An issue of statutory interpretation is reviewed de novo. State v. Shoop, 1 Wn.3d 532, 537, 528 P.3d 363 (2023).

Under the rape shield statute, RCW 9A.44.020(2), "Evidence of the victim's past sexual behavior . . . is inadmissible on the issue of credibility." It is also inadmissible to prove the victim's consent, unless the court rules it is admissible on the issue of consent pursuant to a statutory procedure. RCW 9A.44.020(2)-(3). For such evidence to be admissible on the issue of consent, it must first have sufficient factual similarity to the charged conduct to justify a conclusion that it is

13

No. 83386-3-I/14

minimally relevant. State v. Hudlow, 99 Wn.2d 1, 11, 659 P.2d 514 (1983). The trial court must then find, among other things, it is "not inadmissible because its probative value is substantially outweighed by the probability that its admission will create a substantial danger of undue prejudice." RCW 9A.44.020(3)(d). This inquiry focuses on "prejudice to the factfinding process itself," including "whether the introduction of the victim's past sexual conduct may confuse the issues, mislead the jury, or cause the jury to decide the case on an improper or emotional basis." Hudlow, 99 Wn.2d at 13-14. The potential embarrassment or prejudice to the complaining witness is already reflected in the statute's excluding such evidence as a policy matter. Id. at 13.

Hudlow construed the rape shield statute to avoid a conflict with the Sixth Amendment. Rejecting an argument that the statute conflicted with the confrontation right, the court explained, "the prohibition of sexual conduct evidence is directed at the use of such evidence for impeaching the victim's *general credibility* for truth and veracity." Id. at 8. The statute banned in Washington the "old common law rule," which was "obviously illogical," that had viewed promiscuity by women, but not by men, as evidence bearing on the ability to relate the truth. Id. at 8-9. It was this basis for admissibility of past sexual conduct that was "ruled out altogether." Id. at 8. The statute was not designed to prevent defendants from testifying to "their version of events" but to "erase the misogynistic and antiquated notion that a woman's past sexual behavior somehow affected her credibility." Jones, 168 Wn.2d at 723. The statute does not mean that evidence of past sexual behavior is never relevant. Id. The statute gives way to the constitutional

14

No. 83386-3-I/15

requirement that if evidence is of high probative value, no state interest can be compelling enough to preclude its introduction consistent with the federal and state constitutions. Id. at 723-24.

Bartch did not offer evidence of S.P.'s sexual history for the purpose of impeaching her general credibility. He relied on the evidence to impeach S.P. by contradiction. "Relevant credibility evidence may include specific instances of lying, though 'their admission is highly discretionary under ER 608(b).' " State v. Lee, 188 Wn.2d 473, 488, 396 P.3d 316 (2017) (quoting State v. Kunze, 97 Wn. App. 832, 859, 988 P.2d 977 (1999)). A reporting crime victim's false statement was held to have "minimal probative value" when "it did not directly relate to an issue in the case." Lee, 188 Wn.2d at 488. But a false statement is more likely to be considered "highly probative" if it demonstrates "a specific bias or motive to lie."[5] Id.

The fact of and motivation for a false statement may be more significant than its subject matter. In State v. McDaniel, 83 Wn. App. 179, 181, 920 P.2d 1218 (1996), a complaining witness identified the defendant as having inflicted some of

---

[5] As the dissent observes, Lee commented that evidence of a witness's prior false statement "is not always relevant, particularly when that evidence is unrelated to the issues in the case." 188 Wn.2d at 489. But this statement in Lee does not support the proposition that S.P.'s report of the charged incident to the police the morning after it happened can be fairly characterized as "unrelated to the issues in the case." Lee made this statement in the context of acknowledging broad limits on the protection of the confrontation clause. In the same paragraph, the court distinguished evidence merely "intended to paint the witness as a liar" as less probative than evidence "demonstrating a witness' bias or motive to lie *in a specific case*." Id. at 489 (emphasis added) (citing Olden v. Kentucky, 488 U.S. 227, 109 S. Ct. 480, 102 L. Ed. 2d 513 (1988)). Lee cited Olden as holding it was error to bar cross-examination on a rape victim's extramarital relationship because it "would have shown the victim's bias or motivation." 188 Wn.2d at 489.

15

No. 83386-3-I/16

her injuries. The trial court excluded evidence that the complaining witness testified falsely in a related civil case about the recency of her drug use, after she had conceded in her interview in the criminal case she had used drugs more recently than she had testified. Id. at 182-83. The trial court reasoned the false statement was irrelevant unless it was shown the witness was under the influence of drugs at the time of the alleged incident. Id. at 183. We found a confrontation clause violation. Id. at 186-87. We explained that the importance of the evidence lay in its tendency to undermine the witness's credibility:

> Although the State argues that the trial court properly excluded evidence of Graham's prior false testimony and probation because it concerned the collateral issue of her prior drug use, we are not swayed by the argument. Here, Graham admittedly lied under oath for her own purposes in the related civil proceeding, and the question for the jury was whether she would lie under oath for her own purposes in the criminal proceeding. *The subject matter of the prior false testimony is less important than the fact of that false testimony and the motivation for that false testimony*.

Id. at 186 (emphasis added). Similarly here, Bartch relied on S.P.'s statements about her infidelity to boyfriends to show she gave a false explanation to the police when asked about consent to sexual contact with Bartch. The falsity of the statement is probative of S.P.'s credibility independently of its subject matter.

A number of decisions concern allegedly false reports of rape by the complaining witness in rape prosecutions. In Lee, the court held it did not violate the Sixth Amendment for a trial court in a rape prosecution to exclude the fact a complaining witness's prior false report had been a false report of rape. Lee, 188 Wn.2d at 496-97. The court still permitted the defendant to elicit the fact the complaining witness had made a false report. Id. Even after concluding the

16

unrelated other report had minimal probative value, the Supreme Court described the case as a "close case" and commented "evidence of a witness' dishonesty, including false accusations, may be appropriate and even required in some circumstances." Id. at 496. The trial court's ruling in this case went much farther than the "close case" presented in Lee, because the trial court barred Bartch from introducing evidence of S.P.'s false statement all together.

A concurring opinion in Lee suggested the rape shield statute does not bar evidence of false reports by the complaining witness, even though that precise issue was not before the court. Id. at 485. The concurrence explained it would be consistent with both Washington decisions and "precedent from other jurisdictions that have addressed the issue" to conclude the rape shield statute does not apply to prior false allegations. Id. at 504 n.11 (Gordon-McCloud, J., concurring) (citing cases). These decisions recognize a distinction between the use of past sexual conduct to suggest a generalized conclusion about credibility prohibited by rape shield laws, in contrast to false reporting by the complaining witness, reasoning generally that "false allegations of sexual assault are not sexual conduct." Interest of GH, 152 Haw. 8, 18, 518 P.3d 1158 (2022). States have recognized this distinction by statute, evidence rule, and judicial decision. Id. at 16 n.10. This has been described as the "overwhelming weight of authority."[6] State v. Bray, 356 N.J. Super. 485, 494, 813 A.2d 571 (N.J. Super. Ct. App. Div. 2003).

---

[6] See also Phillips v. State, 545 So. 2d 221, 223 (Ala. Crim. App. 1989) ("[E]vidence of the complaining witness's having brought *false* charges of sexual assault against others does not violate the rape shield statute."); Booker v. State, 334 Ark. 434, 437, 976 S.W.2d 918 (1998) (discussing statutory amendments broadening rape shield law; "[T]his court twice decided that, if a victim's previous

No. 83386-3-I/18

sexual allegations were false, evidence of them is not evidence of 'prior sexual conduct' that is excluded by the rape-shield statute, but instead is evidence of prior misconduct of the alleged victim, which has a direct bearing upon the alleged victim's credibility."); People v. Marx, 467 P.3d 1196, 1206 (Colo. App. 2019) (statutory exception to rape shield law for false reports); State v. Burns, 306 Ga. App. 117, 118-19, 120-21, 829 S.E.2d 367 (2019) (Georgia rape shield law does not prohibit testimony of previous false allegations by the victim because such evidence does not involve the victim's past sexual conduct but rather the victim's propensity to make false statements regarding sexual misconduct); State v. Walton, 715 N.E.2d 824, 826 (Ind. 1999) (false reporting offered to impeach the complaining witness's credibility is "more properly understood as verbal conduct, not sexual conduct."); State v. Barber, 13 Kan. App. 2d 224, 226-27, 766 P.2d 1288 (1989) ("We are persuaded to join the majority of jurisdictions which have considered the question and hold the rape shield statute simply does not apply."; holding proffered statements did not, however, prove falsity); State v. Smith, 743 So. 2d 199, 202 (La. 1999) ("[P]rior false allegations of sexual assault by the victim do not constitute 'past sexual behavior' for purposes of our rape shield statute."); Cox v. State, 51 Md. App. 271, 281, 443 A.2d 607 (1982) ("The challenged question, considered in the light of the proffer, had no relation to the chastity or any sexual misconduct of the witness."), aff'd, 298 Md. 173, 468 A.2d 319 (1983); Commonwealth v. Bohannon, 376 Mass. 90, 95, 378 N.E.2d 987 (1978) ("[T]he proposed questions dealt with prior allegations of rape; they in no way sought to elicit a response concerning the complainant's prior sexual activity or reputation for chastity. We, therefore, do not reach any issues related to the recently enacted 'rape-shield' statute."); State v. Anderson, 211 Mont. 272, 284, 686 P.2d 193 (1984) (rape shield law does not bar "cross-examination of a complaining witness in a sex crime case where there is evidence of prior false accusations"); Miller v. State, 105 Nev. 497, 500-01, 779 P.2d 87 (1989) ("[P]rior false accusations of sexual abuse or sexual assault by complaining witnesses do not constitute 'previous sexual conduct' for rape shield purposes."); State v. Durham, 74 N.C. App. 159, 167, 327 S.E.2d 920 (1985) ("the statute excluded evidence of 'sexual behavior,' but not evidence of language or conversation whose topic might be sexual behavior" if relevant to credibility); State v. Boggs, 63 Ohio St. 3d 418, 423, 588 N.E.2d 813 (1992) ("prior false accusations of rape do not constitute 'sexual activity' of the victim" within the meaning of state's rape shield law); State v. LeClair, 83 Or. App. 121, 126-27, 730 P.2d 609 (1986) ("Evidence of previous *false accusations* by an alleged victim is not evidence of past *sexual behavior* within the meaning of the Rape Shield Law."); State v. Wyrick, 62 S.W.3d 751, 771 (Tenn. Crim. App. 2001) ("The defendant contends and, at oral argument, the state conceded that the evidence that the defendant sought to introduce did not constitute 'sexual behavior' as contemplated under Rule 412. We agree."); State v. Martin, 984 P.2d 975, 979 (Utah 1999) ("Nothing in Rule 412 would exclude evidence of an alleged rape victim's previous false allegations of rape. Evidence of a false accusation would be relevant to Egan's credibility."); Clinebell v. Commonwealth, 235 Va. 319, 322, 368 S.E.2d 263 (1988) ("Clinebell does not

18

Bartch was attempting to prove a specific instance of dishonesty by S.P. when she allegedly gave the police a false reason to believe she would not have consented to sexual contact. To that extent, "[t]he subject matter of the prior false [statement]" is "less important than the fact of that false [statement] and the motivation" for it. McDaniel, 83 Wn. App. at 186. And, to the extent of proving a specific instance of dishonesty, Bartch was not seeking to prove "past sexual behavior" within the meaning of the rape shield statute. RCW 9A.44.020(2). The allegedly false statement at issue is more central to the charged conduct than false accusations of entirely separate events which are widely viewed as potentially admissible and not barred by rape shield laws. Bartch sought to show a false statement by the complaining witness concerning the charged incident, made to the police in a formal statement, the morning after it occurred, and whose falsity is

seek to prove that his daughter has engaged in 'prior sexual conduct' or that she has an unchaste character. He seeks to prove for impeachment purposes that his daughter makes false statements concerning sexual behavior. We conclude that such statements are not 'conduct' within the meaning of Code § 18.2–67.7, and therefore, the section is inapplicable."); State v. Quinn, 200 W. Va. 432, 438, 490 S.E.2d 34 (1997) ("[E]vidence that the alleged victim of a sexual offense has made statements about being the victim of sexual misconduct, other than the statements that the alleged victim has made about the defendant and that are at issue in the state's case against the defendant, is evidence of the alleged victim's "sexual conduct" and is within the scope of West Virginia's rape shield law, W. Va. Code, 61–8B–11 [1986] and West Virginia Rules of Evidence 404(a)(3) [1994], unless the defendant establishes to the satisfaction of the trial judge outside of the presence of the jury that there is a strong probability that the alleged victim's other statements are false." (some alterations in the original)). Many jurisdictions impose requirements such as preliminary hearings outside the presence of the jury, e.g. Bray, 356 N.J. Super. 485, 495-96, 813 A.2d 571 (N.J. Super. Ct. App. Div. 2003), and determinations of relevance, e.g. Wyrick, 62 S.W.3d at 776. To the extent there is any contrary authority it appears exceedingly limited. Taylor v. State, 355 Ark. 267, 272-73, 138 S.W.3d 684 (2003) (a complaining witness's denial of having made false accusations meant the rape shield statute applied).

19

indicated by the witness's later statement in pretrial interviews in the same case. The allegedly false statement at issue here is also more central to the charged conduct than the unrelated false accusation of rape at issue in <u>Lee</u> that the court described as a "close case," and in which the trial court allowed inquiry into the false accusation. 188 Wn.2d at 496. We conclude it was error for the trial court to rely on the rape shield statute to bar evidence that S.P. provided a false statement.

However, not all the evidence on which Bartch relied impeached S.P.'s statements to the police and medical personnel. S.P.'s own statements made in pretrial interviews that she had had sex with others while dating were directly contrary to her statements to the police and medical personnel that she did not consent to sexual contact with Bartch because she would not have done that. S.P.'s inconsistent statements are relevant to her credibility and admissible for that purpose. But the remainder of Bartch's evidence does not impeach S.P.'s statements. The evidence of DNA from other persons in S.P.'s underwear is too inconclusive by itself to permit a conclusion of falsity in S.P.'s statements. S.P.'s having had sex with McCool later in the summer is not evidence her statements were untrue when they were made. S.P.'s boyfriend's anticipated testimony S.P. had had sex with another was inadmissible hearsay, and the anticipated "reputation" evidence lacked an adequate foundation and was not sufficiently based on conduct inconsistent with S.P.'s statements. In the event of retrial, S.P.'s own inconsistent statements may be used to impeach her credibility, but we affirm the exclusion of Bartch's other proffered evidence to impeach S.P.'s statements to the police and medical personnel.

No. 83386-3-I/21

IV

Bartch further assigns error to the exclusion of statements by Johnson describing S.P.'s engaging in certain conversation following the sexual contact, and then allowing Johnson and her sister to testify in a manner Bartch contends substantially contradicted Johnson's earlier statements. We reach this issue also because of its likelihood of arising in the event of retrial. Bartch contends the exclusion of Johnson's reports of S.P.'s statements erroneously both undermined his ability to cross-examine Johnson and risked creating a false impression for the jury. We agree.

On June 27, 2018, Kirkland Police Detective Clayton Slominski interviewed Johnson about the events of the previous night. Johnson reported "a conversation" between herself and S.P. in the car:

> SLOMINSKI: Okay. So you guys are in the car. What did you guys do when you first left his house?
> JOHNSON: Um, we were heading towards my house area, because that's where we—
> SLOMINSKI: Uh-huh.
> JOHNSON: —obviously.
> KAUFMAN: In Monroe?
> JOHNSON: She didn't want to go home because sexual assault—she's been sexually assaulted before. She's a pretty girl. And, like, when you're in a college with a ton of guys, like, it happens. And I think she thinks it's normal, but, it's not. And when she finally realized it wasn't normal, she talked to her mom, like, a week after the first sexual assault happened at—I don't know which—where it was—but her mom kind of—oh, it was her stepcousin who sexually assaulted her first. And then he—um, she talked to her mom and it split the whole family apart. So, obviously, her mom, I think, might have had biased opinions on it.
> And, um, I don't know. But the way it sounded, it kind of seemed like her mom didn't make it important, you know. And I know she's been struggling with that. She told me for the past couple months she's been having nightmares. She went to her doctor, who's been giving her anxiety medicine. She's been having—and

21

her doctor said she's been having PTSD [posttraumatic stress disorder].

. . . .

> SLOMINSKI: And how was she in the car? I know when I saw her, she was asleep in the car?
> JOHNSON: Yeah. Well, for a while, I would say she was awake. We had a conversation. I sat in the back. We were both crying. I was like, "I'm sorry."
> And she was like, "No. I'm sorry."
> And I was like, "You shouldn't be sorry."
> SLOMINSKI: Uh-huh.
> JOHNSON: And she just—she was like, "Stuff like this happens to people all the time."
> And I was like, "It's not normal, though."
> And she just didn't have any emotion whatsoever. And I know [S.P.'s], like—I feel like she's a pretty emotional girl.
> SLOMINSKI: Yeah.
> JOHNSON: But I didn't see one thing on her face. She was just like, "It happens."
> And I was like, "No, it doesn't."
> And I think she felt bad for me, you know. In reality, I just felt bad for her.[7]

Despite this conversation, Bartch claimed that in pretrial interviews, Johnson and Breanna Johnson gave accounts that downplayed the level of alertness S.P. had in the car compared to Johnson's original statements to the police. Bartch asked the court to permit inquiry into S.P.'s statements in the car as Johnson reported to the police, arguing the conversation "significantly undermines this description of [S.P.] as being passed out and unconscious."

---

[7] The State argues the rape shield statute applies to these statements, claiming the "purpose of the statute is to eliminate prejudicial evidence of prior sexual conduct of a victim, which often has little, if any relevance to the issues for which it is offered." This is incorrect. See State v. Carver, 37 Wn. App. 122, 123-24, 678 P.2d 842 (1984) (rape shield did not apply where "the evidence sought to be admitted here was prior sexual abuse, not *misconduct,* of a victim"). Any abuse by another was not sexual "misconduct" of S.P.

Bartch argued the content of the conversation showed S.P. was "logical and coherent," "able to reflect on what had happened at Mr. Bartch's house," and had "capacity" within a short time after leaving Bartch's residence. Bartch argued only the content of the conversation would rebut the State's argument that S.P. was "unconscious in the back seat," arguing, "[I]f this is all excluded, the jury is going to be left with the impression that she's passed out unconscious in the back seat, which is not the case."

The trial court ruled that Bartch could inquire of the witnesses concerning "their observations of the alleged victim's demeanor, her capacity to express thoughts, her mental abilities, her cogency." But the trial court ruled Bartch could not inquire about "what the alleged victim said." The court saw Bartch's proffered reasoning for eliciting the content of S.P.'s statements as "tied to witnesses' observations of mental acuity and capacity." The court ruled this did not justify permitting inquiry into the substance of the statements because the court viewed the substance as "inflammatory" with a "high possibility of prejudicial effect outweighing any probative value of the actual words themselves as opposed to a description by the witnesses of the manner in which the words were delivered."[8]

Concerning the time in the car, Johnson testified S.P. was "laying down" in the backseat. Johnson testified S.P. "said she didn't want to go home." She testified S.P. was "passed out . . . like, going in and out, and, like, she would answer

---

[8] In addition to relying on unfair prejudice under ER 403, the trial court excluded Johnson's reports of S.P.'s statements in the car on hearsay grounds. It is clear that S.P.'s statements in the car were not hearsay, as they were not offered for the truth of the matter asserted.

No. 83386-3-I/24

some questions and she didn't answer some other ones.  And she just was asleep and then, like, not asleep and then asleep."  Johnson testified S.P. "was pretty much asleep the whole time, so she was just very drowsy and tired," and any response to questions "was very short."  Johnson stated, "Sometimes her answers wouldn't quite make sense."  In reference to the time after they left the Monroe police department and were driving to the Kirkland police department, the State asked Johnson if S.P. "roused at all" and Johnson answered, "No."  On cross-examination, when asked if Johnson was able to have a conversation with S.P., Johnson answered, "Barely."  When asked if S.P. participated in a discussion about where to go next, Johnson answered, "Yes."  When asked whether S.P. "was able to express her thoughts to you through words," Johnson answered, "Barely, yes."  When asked whether S.P. was expressing "cogent thoughts in the conversation," Johnson answered, "I personally wouldn't say so, no."

The State asked Breanna Johnson about S.P.'s "consciousness and cognition" when leaving Bartch's residence, and she testified, "No consciousness, no cognition."  Breanna Johnson testified:

> Q.  And as you're driving in that direction, were you able to observe whether [S.P.] was awake or responding to anything you and your sister were discussing?
> A.  She was unconscious.
> Q.  And did you or your sister ever ask her what she wanted to do?
> A.  She was unconscious.  We couldn't ask her.
> Q.  Do you recall whether she was able to respond to anything when you guys left Mr. Bartch's house?
> A.  She could not.
> Q.  At some point, did she become conscious?
> A.  She did.
> Q.  And do you recall what point that was?

24

No. 83386-3-I/25

> A. It was very briefly, and it was all mumbles. And it was about—
> we were almost—I don't recall, no.

At some point S.P. became "sort of conscious." When asked if S.P. was awake while they were at the police station in Monroe, Breanna Johnson testified, "No." In reference to the drive to the Kirkland police station, Breanna Johnson testified S.P. "was still incoherent." When asked if S.P. was awake when they arrived at the Kirkland police station, Breanna Johnson testified, "No."

Johnson was the only eyewitness, besides S.P. herself, who was able to observe S.P.'s condition before, leading up to, and after the sexual contact with Bartch. Bartch argues the "trial court's ruling destroyed the defense's ability to establish S.P.'s actual capacity in the minutes after leaving Mr. Bartch's [home] and thereby argue she must have possessed capacity before she left." In his reply brief, Bartch argues that the exclusion of this evidence violated his constitutional right to "cross-examine the witnesses against him." Bartch's challenge is fairly viewed as asserting that the trial court's ruling violated his Sixth Amendment right to cross-examine Johnson.[9] See State v. Orn, 197 Wn.2d 343, 352, 482 P.3d 913 (2021). We agree with Bartch that the trial court erred in excluding Johnson's statements about her conversation in the car with S.P. We reach this conclusion as a matter of Washington evidence law rather than under the Sixth Amendment.

---

[9] Given that Bartch challenges the trial court's ruling on the ground it limited his ability to cross-examine Johnson and Breanna Johnson, we do not view his reply brief as presenting a new argument. Cf. RAP 10.3(c), 12.1; Ainsworth v. Progressive Cas. Ins. Co., 180 Wn. App. 52, 78 n.20, 322 P.3d 6 (2014) ("We will not consider issues argued for the first time in the reply brief. The reply brief is limited to a response to the issues in the responding brief. To address issues argued for the first time in a reply brief is unfair to the respondent and inconsistent with the rules on appeal." (Citation omitted)).

No. 83386-3-I/26

In analyzing whether a trial court's evidentiary decision violated a defendant's Sixth Amendment right to present a defense, we first review the court's evidentiary ruling for an abuse of discretion. State v. Jennings, 199 Wn.2d 53, 58, 502 P.3d 1255 (2022). If we conclude the evidentiary ruling was not an abuse of discretion, we then consider de novo whether the exclusion of evidence violated the defendant's constitutional right to present a defense. Id. In Hudlow, the court adopted an approach of "balancing the defendant's right to produce relevant evidence versus the state's interest in limiting the prejudicial effects of that evidence" in such cases. 99 Wn.2d at 16.

A trial court's ER 403 ruling is reviewed for abuse of discretion. State v. Caril, 23 Wn. App. 2d 416, 427, 515 P.3d 1036 (2022), review denied, 200 Wn.2d 1025, 522 P.3d 50 (2023). "A trial court abuses its discretion when its decision is manifestly unreasonable or exercised on untenable grounds or for untenable reasons." State v. Lord, 161 Wn.2d 276, 283-84, 165 P.3d 1251 (2007). A decision that is contrary to law or based on an incorrect application of an evidentiary rule is an abuse of discretion. State v. Neal, 144 Wn.2d 600, 609, 30 P.3d 1255 (2001).

Referencing both the Hudlow constitutional standard and ER 403, we have explained that "[i]n determining whether the probative value of proffered evidence is outweighed by its prejudicial effect, the proper focus is on the truth-finding process." State v. Dickenson, 48 Wn. App. 457, 469, 740 P.2d 312 (1987). The record does not show that in evaluating Johnson's reports of S.P.'s statements in the car the trial court considered both their value as evidence of S.P.'s cognition

26

No. 83386-3-I/27

and their value in impeaching Johnson's trial testimony. That the evidence would impeach a key prosecution witness significantly bolsters its probative value. " '[T]he more essential the witness is to the prosecution's case, the more latitude the defense should be given to explore fundamental elements such as motive, bias, [or] credibility.' " Orn, 197 Wn.2d at 354 (last alteration in original) (quoting State v. Darden, 145 Wn.2d 612, 619, 41 P.3d 1189 (2002)).

Washington decisions have been skeptical of limitations on cross-examination that appear to give a key government witness latitude to testify without contradiction through other available evidence. In Darden, the defendant sought to introduce the location of a law enforcement surveillance post, in order to challenge the opportunity of a law enforcement witness to view the defendant's actions. 145 Wn.2d at 617-18. The trial court prohibited the defense from eliciting the precise location from which a police officer allegedly observed the defendant, but allowed only "general questions" about the witness's ability to see. Id. at 618. The police officer claimed "there were no obstructions, not even windows, between the surveillance post and the corner" where the defendant was allegedly observed. Id. at 616. Because the State in Darden did not articulate an interest in barring the defense cross-examination for a reason associated with the fairness of the trial (as opposed to only the secrecy of the surveillance post), the court concluded the Hudlow constitutional test did not apply. Id. at 623. The court nevertheless reversed. With the State conceding an abuse of discretion by the trial court, application of "basic rules of evidence" led to the conclusion that the State had

No. 83386-3-I/28

failed to justify exclusion, such as under ER 403, of the relevant fact of the vantage point of a "crucial witness."[10]  Id. at 618, 624-25.

Other Washington decisions have found similar errors in limitations on cross-examination, based on both the constitutional standard and the rules of evidence.  In Dickenson, we held it was reversible error to exclude a prior statement of a prosecution witness when it contradicted the " 'whole impression or effect' " of the witness's testimony in court.  48 Wn. App. at 467-68 (quoting 5 KARL B. TEGLAND, WASHINGTON PRACTICE § 256 (1982)).  In State v. Johnson, 90 Wn. App. 54, 70-71, 950 P.2d 981 (1998), we held the trial court erred by not allowing cross-examination showing that a shooting victim had made statements to the effect he anticipated receiving victim compensation benefits in the event the defendant was convicted.  We noted the demands of the confrontation clause, but we again did not limit our analysis to the Sixth Amendment, considering as well the law governing impeachment by prior inconsistency and bias.  Id. at 69, 70-71. Johnson's reliance on general principles of evidence law in addition to the Sixth Amendment is underscored by its citation of Shaw v. Sjoberg, 10 Wn. App. 328, 517 P.2d 622 (1973), a civil case not subject to the Sixth Amendment.  See Johnson, 90 Wn. App. at 71.  In Shaw, we remanded for a new trial on a civil claim arising from an automobile collision, because the trial court had refused to permit a witness to be impeached with testimony the witness had given at an earlier traffic citation hearing.  10 Wn. App. at 329, 332.

---

[10] The court separately rejected the State's claim to a privilege independently protecting the location of a surveillance post.  Id. at 626, 628.

28

No. 83386-3-I/29

Some Washington decisions decided under the Sixth Amendment are nevertheless informative of the proper interpretation of ER 403 in considering the latitude of cross-examination of a key government witness. In Orn, the victim of a shooting testified against Orn, providing evidence of Orn's "expressions of intent" and "his own response" at the time of the shooting. 197 Wn.2d at 354. The trial court excluded the victim's agreement to serve as an informant to law enforcement on unrelated controlled buys of drugs, stolen property, or firearms, in exchange for forbearance of felony charges. Id. at 349-50. The Supreme Court described the trial court's rationale as an "implied reference to ER 403." Id. at 351. On the subject of the witness's arrangement with law enforcement, the trial court allowed only one question, " '[I]sn't it true that since this incident, you have actually worked with Kent Police Department?' to which [the witness] responded, 'Yes.' " Id. at 350 (first alteration in original). With other evidence excluded, the one question which was allowed was misleading. Id. at 352. The court held it was error to bar cross-examination on bias "[e]ven under the abuse of discretion standard." Id. at 353. The court nevertheless applied Hudlow and evaluated the factors relevant to determining whether an evidentiary exclusion violated the confrontation clause. Id. at 353-58. The court concluded the exclusion of the informant agreement violated Orn's constitutional rights, and for that reason was also an abuse of discretion in applying ER 403. Id. at 358-59.

We found an analogous constitutional violation in State v. Chicas Carballo, 17 Wn. App. 2d 337, 354-55, 486 P.3d 142, review denied sub nom. State v. Chicas-Carballo, 198 Wn.2d 1030, 498 P.3d 962 (2021). There, a witness denied

29

knowledge of a crime while being interviewed by police "for 234 pages [of transcribed statements]." Id. at 350 (alteration in original). But the witness provided information identifying the defendant during the interrogation after she had been warned of potential immigration consequences including removal from the country. Id. at 342. Even after the witness acknowledged untruthfulness at trial, the trial court excluded reference to the witness's immigration status under then newly effective ER 413, despite provisions in that rule allowing for evidence establishing bias and evidence necessary to a defendant's constitutional rights. Id. at 347-48. We found a constitutional violation in the exclusion of "evidence of the key witness' motive to fabricate." Id. at 353, 355.

When considering the whole impression or effect of Johnson's trial testimony as Dickenson directs, it was that S.P. was unable to meaningfully converse during the car ride to the police station. 48 Wn. App. at 467-68. When defense counsel attempted cross-examination within the parameters of the court's ruling and inquired if S.P. was able to make conversation, Johnson testified, "I personally wouldn't say so, no." This was directly contrary to Johnson's statement to the police the morning of the sexual contact explaining that S.P. had articulated that she did not wish to return home together with providing a rationale for that wish—as Johnson stated, "We had a conversation." The limitation on cross-examination suffered from the same flaw present in Darden. Facing only general cross-examination about S.P.'s consciousness, Johnson was able to minimize S.P.'s level of cognition without risk of contradiction. Dickenson, Johnson, Shaw, Orn, and Chicas Carballo rely alternately on the confrontation clause and

30

No. 83386-3-I/31

Washington evidence law, but they share the commonality of holding it is error to permit a key witness to testify to a version of events while excluding prior inconsistent statements of the witness that would call into question that version of events. It was an abuse of discretion to apply ER 403 in a manner permitting Johnson to testify without being subject to cross-examination on her prior inconsistent statements.[11]

We do not disagree that there was risk of unfair prejudice within Johnson's report of S.P.'s statements in the car. They concern an entirely separate sexual assault, where this alleged victim is the reporting party, and where her mother, to some extent, did not believe her. There is a risk a jury could fail to credit S.P.'s testimony here, not because of the content or nature of her testimony, but because her mother did not believe her in an entirely separate and highly emotionally-charged incident. At the same time, this is the conversation that Johnson reported

---

[11] We have applied similar principles beyond impeachment and cross-examination. In State v. Broussard, 25 Wn. App. 2d 781, 784, 525 P.3d 615 (2023), a complaining witness asserted the defendant had raped her in the room he rented, during which "she raised her voice and yelled at [the defendant] to stop." The defendant asserted a Sixth Amendment violation based on the trial court's exclusion of testimony of a roommate, who would have testified he could hear " 'pretty well' " into the defendant's room and never heard a woman yelling from it. Id. at 785, 788. The trial court excluded the evidence as lacking foundation because the roommate could not recall the exact night of the alleged rape, despite the roommate's explaining he " 'was there almost all the time in the evenings.' " Id. at 788. We held the roommate's testimony was sufficiently based on his firsthand knowledge that doubt about his having been home the night at issue went to weight rather than admissibility, and further that the State opened the door to the testimony by arguing in opening statement that the defendant had made sure no one was home in the apartment. Id. at 789, 791-92. We observed, " 'A party may open the door to otherwise inadmissible evidence by introducing evidence that must be rebutted in order to preserve fairness and determine the truth.' " Id. at 791 (quoting State v. Wafford, 199 Wn. App. 32, 36-37, 397 P.3d 926 (2017)).

31

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

occurred. That the subject matter is one that is intensely intimate to S.P. is incidental to (and arguably supportive of) its evidencing her having a mental state capable of such a conversation at the time. By excluding the evidence and allowing Johnson to downplay S.P.'s consciousness, the trial court's ruling led to the same kind of misimpression as in Orn. While there was risk of unfair prejudice, it did not substantially outweigh the significant probative value of the evidence.

Because we reverse Bartch's conviction, we do not reach his claims of prosecutorial misconduct during closing argument, nor his claim of cumulative error. We reverse and remand for proceedings consistent with this opinion.

_____
Birk, J.

WE CONCUR:

_____        _____
                                        Hazel, ACJ

32

No. 83386-3-I <u>State of Washington v. Brogan R. Bartch</u>

DíAZ, J. (dissenting) — I concur in part and respectfully dissent in part.

I agree with the majority that, under <u>Crossguns</u>, the trial court erred when it admitted Bartch's sexual advances towards S.P. expressly pursuant under the "lustful disposition" doctrine. 199 Wn.2d 282, 290, 505 P.3d 529 (2022).[1] I further agree with the majority that that the State did not meet its burden to show that there was another permissible purpose for this evidence or that the evidence was otherwise harmless. Thus, reversal is required.

I write separately because, first, I believe the analysis should have ended there. "In the interest of judicial economy," I would have "decline[d]" to reach any additional issue because it is unclear whether the resolution of those issues would "assist the trial court on remand" or whether these issues are "likely to occur following remand." <u>See</u> <u>State v. Orozco</u>, 19 Wn. App. 2d 367, 378 n.4, 496 P.3d 1215 (2021) and <u>State v. Spokane County Dist. Court</u>, 198 Wn.2d 1, 16, 491 P.3d 119 (2021) respectively; <u>see</u> <u>also</u>, <u>e.g.</u>, <u>Wash. State Farm Bureau Fed'n v. Gregoire</u>, 162 Wn.2d 284, 307, 174 P.3d 1142 (2007) (declining to "'reach[] any other issues that might be presented'" because the "'resolution of [the primary issue] effectively disposes of a case'") (quoting <u>Hayden v. Mut. of Enumclaw Ins. Co.</u>, 141 Wn.2d 55, 68, 1 P.3d 1167 (2000)).

The interest of judicial economy is particularly germane here because the additional issues are of "constitutional proportions." <u>See</u>, <u>e.g.</u>, <u>State v. Hall</u>, 95

---

[1] It should be acknowledged that our Supreme Court published <u>Crossguns</u> on March 10, 2022, after the trial of this matter, and that the trial court did not have the benefit of that decision when admitting this evidence.

No. 83386-3-I/2 (DÍAZ, J., dissenting)

Wn.2d 536, 539, 627 P.2d 101 (1981) ("A reviewing court should not pass on constitutional issues unless absolutely necessary to the determination of the case."); see also State v. Huber, No. 79661-5-I, slip op. at 14 (Wash. Ct. App. Aug. 12, 2019), (unpublished), https://www.courts.wa.gov/opinions/pdf/796615.pdf;[2] cf. Philadelphia II v. Gregoire, 128 Wn.2d 707, 716, 911 P.2d 389 (1996) (where the Court felt "compel[led]" by "judicial economy" to address an additional constitutional issue because "there is every reason to believe that the [plaintiff] would seek an injunction if we were to remand the case.").

The majority chooses to reach two additional evidentiary issues, which present constitutional questions, because it believes these issues are "likely to arise in the event of retrial" and because "the focus of a retrial would be more particularly on the events" surrounding the alleged crime. Respectfully, we do not know whether the State will choose to retry this matter at all without the "lustful disposition" evidence, which forcefully framed both its opening statement and closing argument. And, if it does, we do not know how the parties would try the case, including what evidence they would offer or how they would seek its admission. Nor do we know how the trial court would rule, particularly now that the parties have more fully fleshed out the disputes. Given these uncertainties, I would not have reached these issues.

---

[2] We may properly cite and discuss unpublished opinions where, as here, doing so is "necessary for a reasoned decision." GR 14.1(c). Huber ties together the principle of judicial economy with the general admonishment to tread only as necessary into constitutional questions. I adopt that reasoning.

As the majority's opinion did not end there, however, I respectfully write to convey my partial disagreement with the majority's resolution of those two additional issues.

## I.      ANALYSIS

### A.  S.P.'s Statements Regarding her "Fidelity" to her Then-Boyfriend

#### 1.  Defining the areas of disagreement

As the majority accurately recounts, S.P. told law enforcement and others that, after she went into Bartch's bedroom, she was "pretty sure [she] went to sleep because . . . I have a boyfriend, so I would never try to, like be with someone else." To establish a contradiction, Bartch sought to introduce (1) S.P.'s own later statements that "she had sex with other individuals around the time of" the sexual contact; (2) testimony from a crime lab analyst who found DNA from sperm from persons other than Bartch or her then-boyfriend; (3) testimony from a person (McCool) with whom she was later unfaithful to her then-boyfriend; (4) testimony of a person who claimed S.P. had a "reputation for being unfaithful to her boyfriends"; and (5) testimony from her then-boyfriend who claimed she was unfaithful to him.  All this evidence, Bartch asserted, "directly undermines her rationale for asserting that she is 'pretty sure [she] went to sleep.'"

The majority affirms the exclusion of all this evidence (for various reasons), except for (1) S.P.'s statements that (a) she would "never try to, like, be with someone else"  and (b) "she had sex with other individuals around the time of" the sexual contact.  I concur with the exclusion of evidence (2) through (5) above, but I respectfully dissent as to (1) S.P.'s statements because that evidence is unrelated

or "collateral" to the issues in the case, the rape shield statute precludes its admission, and the trial court did not abuse its significant discretion in finding this evidence would confuse or distract the jury from the issues at trial.

2. Discussion

The majority does not dispute that the substantive "subject matter" of this evidence fundamentally concerns S.P.'s past sexual behavior. The majority also does not dispute that, for nearly 50 years, RCW 9A.44.020(2) has prohibited the cross-examination of a sex crime victim as to the victim's past sexual behavior "on the issue of credibility," subject to a rigorous test. State v. Roberts, 25 Wn. App. 830, 835, 611 P.2d 1297 (1980) (citing RCW 9A.44.020(2)-(3)). Indeed, "credibility is ruled out *altogether* as the basis for introducing past sexual conduct." State v. Hudlow, 99 Wn.2d 1, 8, 659 P.2d 514 (1983) (emphasis added).

Instead, the majority relies on a distinction between, on the one hand, the issue of general credibility (which it acknowledges is verboten) and, on the other, a defendant's right to "impeach [a State's witness] by contradiction." The majority states, "[t]he rape shield statute was not intended to bar evidence of a specific instance of dishonesty in the circumstances present here, and so does not apply merely because the subject matter of the dishonesty concerned the speaker's sexual history."

I respectfully dissent, first, because it "is well settled that neither party may impeach a witness on a collateral issue; that is, on facts not directly relevant to the trial issue." State v. Aguirre, 168 Wn.2d 350, 362, 229 P.3d 669 (2010) (adding, "Facts are relevant if they have a tendency to make the existence of any

4

consequential fact more or less probable. ER 401."); State v. Lee, 188 Wn.2d 473, 489, 396 P.3d 316 (2017)) ("evidence of a witness' prior false statement is not always relevant, particularly when that evidence is unrelated to the issues in the case.").

Here, as the parties accurately state, "[t]he issue at trial was whether S.P. was incapacitated to the extent that she was unable to consent or was unconscious . . ." Br. of Resp't at 21; Br. of Appellant at 12 ("This case . . . turned on whether S.P. lacked capacity to consent."). In other words, the consequential "trial issue" was, not whether S.P. would *choose* to be "unfaithful" and consent (which is the substance of S.P.'s conflicting statements), but whether, as a purely cognitive question, she was *capable* of consent. S.P.'s willingness to consent is collateral. See State v. O'Connor, 155 Wn.2d 335, 349, 119 P.3d 806 (2005) ("In exercising its discretion [to admit or exclude evidence under ER 608(b)], the trial court may consider whether the instance of misconduct is relevant to the witness's veracity on the stand *and* whether it is *germane or relevant* to the issues presented at trial.") (emphasis added).

Even if the testimony had some relevancy to the trial issue, Aguirre is instructive. There, the State charged the defendant with sex crimes and "the question relevant to the trial issue of the defendant's guilt was whether the victim contacted *the defendant* after the rape and assault." Aguirre, 168 Wn.2d at 362. The defendant offered the testimony of his brother whom the victim contacted online, but allegedly "in an effort to get in touch with the defendant." Id. The defense "argued that this testimony was relevant because it would impeach the

5

victim's [prior] testimony that she had not contacted" *the defendant's brother* online, "thereby undermining her credibility." Id. Our Supreme Court rejected that conflation of the issues, holding in pertinent part that "the proffered testimony was not *directly* relevant to a trial issue and the trial court did not err by excluding it as impeachment on a collateral issue." Id. (emphasis added).

In short, without some showing that the impeaching testimony is "directly relevant to a trial issue," a trial court may as here exclude such evidence as collateral. Id.

The majority attempts to connect S.P.'s inconsistent statements about her "fidelity" to the issue at trial (her capacity to consent) by suggesting that her "false statement is . . . highly probative [as it] demonstrates a specific bias or motive to lie."

I respectfully find nothing in the record to suggest that this falsehood reveals S.P. had some motive to lie. There is no evidence that she lied about her ability to consent in order to maintain her reputation for "fidelity," or any evidence about a community where that reputation would matter. There is no evidence that there would have been any negative consequences to S.P. (e.g., marital, financial, or employment-related) from being unmasked as an "unfaithful" person, thus spurring her to concoct a story that she was too intoxicated to consent. I respectfully find it speculative to suggest there was a connection between her statements to law enforcement about how much she had to drink and what she remembered about that night, on the one hand, and her statements about her "fidelity," on the other.

On the contrary, upon questioning by the prosecutor, S.P. was very blunt

6

about her "infidelity," stating, "I did [cheat on her then-boyfriend], yes. I'm not going to lie." This is hardly the response of a person seeking to "misrepresent[] what happened out of shame or embarrassment," as Bartch speculatively claims. Br. of Appellant at 6. Without such evidence in the record, the purpose of this evidence remains collateral.[3]

Second, and directly as to the applicability of the rape shield statute, I respectfully dissent because the majority creates a distinction without a difference, on these facts, between impeachment by contradiction and an attack on her credibility by references to her sexual history.

Tellingly, Bartch frames this argument differently. Bartch first concedes that, "S.P.'s false claims of fidelity would not otherwise have been relevant to this action, *except* that *S.P. made them relevant* by premising her story to the police and medical personnel about what happened in Mr. Bartch's room on these demonstrably false statements." Br. of Appellant at 75 n.9. And, Bartch then acknowledges that "impeachment by contradiction *is* the time-honored and venerated *method of measuring the credibility* of a witness and seeking the truth in a criminal trial." (emphasis added).

In other words, whether S.P. was faithful to her boyfriends or not again had no independent relevancy (i.e., it was collateral); and the impeachment is offered *only* to undermine S.P.'s credibility using facts about her sexual practices. I

---

[3] Moreover, unlike the cases the majority cites, S.P.'s statements were not made "under oath for her own purposes in [a] related civil proceeding" and are not "admitted" false accusations of rape, where the same victim is accusing a second person of rape. State v. McDaniel, 83 Wn. App. 179, 181, 920 P.2d 1218 (1996); State v. Lee, 188 Wn.2d 473, 488, 396 P.3d 316 (2017). Unlike McDaniel, there is no evidence that S.P. had "her own purposes" for making false statements. And, unlike the other cases the majority cites, her statements did not have the reliability of sworn testimony or the gravity of an "admitted" instance of a false report.

No. 83386-3-I/8 (DÍAZ, J., dissenting)

respectfully submit that impeachment by the alleged victim's inconsistent statements about her irrelevant sex life is indistinguishable from the attempt to undermine her general credibility, which is "altogether" out of bounds. Hudlow, 99 Wn.2d at 8. Were we to permit such a distinction – and a trial court took the distinction to its logical extreme – then a defendant could seek admission of collateral statements victims make about their sexual history, as long as a "contradiction" is found about that history, which then would be outside the protections of the rape shield statute. I fear this distinction may swallow the statute whole. That result should not be permitted because putting an alleged victim's sexual history on trial because of an irrelevant stray inconsistency would discourage rape victims from "'step[ping] forward and prosecut[ing] these crimes.'" Lee, 188 Wn.2d at 495 (alteration in original) (quoting Hudlow, 99 Wn.2d at 16).

Third, I respectfully dissent because – no matter how you consider them – these questions are left to the significant discretion of our trial judges.

At its most general, "[q]uestions of relevancy and the admissibility of testimonial evidence are within the discretion of the trial court, and we review them only for *manifest* abuse of discretion." Aguirre, 168 Wn.2d at 361 (emphasis added). And an "erroneous ruling with respect to such questions requires reversal only if there is a reasonable possibility that the testimony would have changed the outcome of trial." Id. More specifically, "we review a trial court's decision to limit cross-examination of a witness for impeachment purposes for abuse of discretion." Id. at 361-62. And even more specifically, "[r]elevant credibility evidence may include specific instances of lying, though 'their admission is *highly discretionary*

8

No. 83386-3-I/9 (Díaz, J., dissenting)

under ER 608(b).'" Lee, 188 Wn.2d at 488 (emphasis added) (quoting State v. Kunze, 97 Wn. App. 832, 859, 988 P.2d 977 (1999)). Finally, with respect to constitutional implications, "'[t]rial judges retain wide latitude insofar as the Confrontation Clause is concerned to impose reasonable limits on such cross-examination based on concerns about, among other things, harassment, prejudice, confusion of the issues, the witness' safety, or interrogation that is repetitive or only marginally relevant.'" Lee, 188 Wn.2d at 487 (quoting Delaware v. Van Arsdall, 475 U.S. 673, 679, 106 S. Ct. 1431, 89 L. Ed. 2d 674 (1986)).

In short, no matter how you look at the issues presented, our trial courts are vested with significant discretion with respect to these decisions. In turn, I would not hold it was a manifest abuse of discretion for the trial court to find that "[t]hese are very personal issues and they have a high likelihood of inflaming the jury and distracting them and confusing them."[4]

For these reasons, I respectfully partially dissent on this issue.

B. S.P.'s statements during the car ride to the police station

The majority concludes that the exclusion of Johnson's statements to law enforcement about her dialogue with S.P. during the car ride to the police station "erroneously both undermined his ability to cross-examine Johnson and risked creating a false impression for the jury." The majority reaches "this conclusion as

---

[4] Moreover, I would conclude that (a) Bartch has made no showing that the trial would have been remotely different had these two sentences about S.P.'s fidelity been admitted because it simply, again, does not go to the core issue at trial (S.P.'s capacity), which the court instructed the jury to focus on; and (b) any such error was harmless because Bartch was still able to present ample testimony regarding S.P.'s ability to consent, as will be discussed in the following section.

9

a matter of Washington evidence law rather than under the Sixth Amendment."[5]  It further holds that, while there "was risk of unfair prejudice, it did not substantially outweigh the significant probative value of the evidence."

I respectfully dissent for three reasons.  First, it was not an abuse of discretion to find that, while relevant, S.P. and Johnson's conversation was of minimum probative value as a reasonable person could view the dialogue, as the court did, as a "high level bouncing back and forth."  Second, Johnson was not "a key prosecution witness" in the context of the rest of the evidence.  Finally, and most importantly, as the majority recognizes, the subject matter of the dialogue was "entirely separate and highly emotionally-charged," and a reasonable person could agree with the court that the risk of unfair prejudice to the State would outweigh the minimal probative value.

As a preliminary but important matter, our standard of review again is quite deferential, as a trial court abuses its discretion if no reasonable person would take the view it adopted.  State v. Atsbeha, 142 Wn.2d 904, 914, 16 P.3d 626 (2001).

As the majority accurately recounts, S.P.'s statements, in summary form, described (a) one feeling S.P. had (of not wanting to go home), (b) two negative memories she had arising from the unrelated sexual assault (the effect of S.P.'s reporting on her family and on her own mental health), and (c) her generalized feeling of resignation that sexual assaults happen "to people all the time."  These

---

[5] I will follow the majority's lead in analyzing this assignment of error exclusively as an evidentiary error and not a constitutional error. Should we have gone on to analyze a possible constitutional error, I believe it should have failed because "phrasing an evidentiary ruling as a constitutional claim [does not] provide a means for an end run around the Rules of Evidence," and because the second step of the analysis should not be "merely a repetition of the analysis undertaken at step one," State v. Ritchie, 24 Wn. App. 2d 618, 629, 520 P.3d 1105(2022) (citing State v. Lizarraga, 191 Wn. App. 530, 553, 364, P.3d 810 (2015)), which is what effectively Bartch does.

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

handful of feelings and memories occurred up to one and a half hours after the sexual contact, and during a car ride that lasted 75 minutes.

While Bartch argued, based on these statements alone, that S.P. was "logical and coherent" and "able to reflect on what had happened at Mr. Bartch's house," the court disagreed, stating, "I'm not looking at a cohesive narrative of another event on the transcripts you've offered so far. It's pretty high-level bouncing back and forth."

Whether or not any particular judge would agree that the court's interpretation of the thrust and content of the statements is fully comprehensive and entirely accurate, I would conclude, first, that a reasonable person could agree with the court's characterization that the probative value was minimal. In other words, it was not unreasonable for the court to find that the transcript of Johnson's statements was atmospheric, muddled, or did not provide sufficient information to draw an inference as to S.P.'s capacity, which was the sole purpose Bartch offered for the evidence. In short, a reasonable person could agree with the court that the material was not detailed, clear or precise enough to admit.

The majority further holds the testimony Johnson ultimately gave created a misimpression about her views on S.P.'s capacity during the car ride. State v. Orn, 197 Wn.2d 343, 347, 482 P.3d 913 (2021), however, provides a useful contrast. There, the defense sought to cross-examine Seamans, the State's *sole* testifying eyewitness against Orn, as to the fact that Seamans worked as an informant for the police department in exchange for that same department refraining from forwarding unrelated felony charges against him to the prosecuting attorney. Id.

at 349, 351. The trial court granted the State's motion in limine to exclude Seamans's informant agreement and to allow Orn to ask *a single* question of Seamans, namely, "[i]sn't it true that since this incident, you have actually worked with the Kent Police Department?" Id. at 350.

Our Supreme Court held that, by allowing only a single question about whether Seamans "worked" for the department and excluding the agreement, the trial court violated Orn's right to confront Seamans. Id. at 352. The Court emphasized that, if the single allowed question had not been so misleading, it would be a closer case, and the court's decision to admit or exclude evidence would have been subject to an abuse of discretion standard, as here. Id. at 253.

At its core, the issue here is whether S.P. was coherent in the car. Johnson testified S.P. "said she didn't want to go home," but omitted the reasons pursuant to the court's ruling. Otherwise, essentially, Johnson described S.P. as "answering some questions" with "very short" answers and not answering others, sometimes asleep and sometimes not. Such descriptions were not inconsistent with her statements to law enforcement, and a reasonable person could adopt the court's view that the testimony did not significantly differ from those statements because her statements did not purport to describe the entirety of the 75-minute car ride, capture every statement S.P. made, or encompass all of Johnson's views on S.P.'s capacity at that moment.

Further, unlike in Orn, the trial court here did not limit the defense to a single question, but allowed the defense to explore S.P.'s "demeanor, her capacity to express thoughts, her mental abilities, her cogency." In other words, Batch had

12

the ability to disabuse the jury from any misimpression that may have been created, unlike in Orn.

I respectfully disagree, second, with the majority that on the key issue at trial (S.P.'s capacity to consent) Johnson is a key witness. Bartch testified to his own recollections, and called numerous witnesses to testify, as to S.P.'s capacity immediately before and after the sexual contact occurred. Specifically, Bartch himself testified that S.P. initiated physical contact by scratching his back and kissing, and he further testified that twice she agreed to go to bed with him, all of which showed her capacity. The defense further played a video of S.P. taken by Johnson shortly before the alleged assault, which Bartch argued demonstrated her capacity to consent. Bartch further described S.P. as being "engaged in [a] conversation" with his brother, Bridger. Bartch's brothers testified about S.P.'s appearance shortly before the assault and even immediately after the assault, which they claimed evidenced capacity. And, of course, Bartch testified entirely to his version of the alleged sexual assault and as to his perceptions of S.P.'s mental capacity during that time. Finally, Bartch contradicted Ashlyn and Breanna Johnson's testimony about S.P.'s condition at the time she left his house. These incidents occurred at various points in the night closer in time to the sexual contact than when S.P. got in the car. In that context, Johnson's testimony was not a "crucial witness" such that the trial court was obligated to impose limitations on cross-examination more cautiously.

Stated otherwise, unlike in Orn or in State v. Chicas Carballo, 17 Wn. App. 2d 337, 346, 486 P.3d 142 (2021), cited by the majority, Johnson was not the only

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

or key witness to the events in or immediately after the car ride. Cf. Orn, 197 Wn.2d at 355 (Semans was "the only testifying eyewitness to the crime"); Chicas Carballo, 17 Wn. App. 2d at 351 (the State conceded that "Flores was the key witness to implicate Chicas Carballo in the murder"). Here, Johnson was not even the only person in the car ride to the police station. And, multiple police officers testified as to S.P.'s mental state upon arriving at the station, after the dialogue.

In short, the court's ruling did not "leave the defense powerless" nor did it "dismantl[e] Mr. Bartch's affirmative defense," as Bartch claims. Br. of Appellant at 47.

Third and finally, I respectfully dissent because a reasonable person could also agree with the trial court that the subject matter of the transcripts was "inflammatory" and that there was "a high possibility of prejudicial effect outweighing any probative value of the actual words themselves as opposed to a description by the witnesses of the manner in which the words were delivered." If permitted, the jury would have heard testimony about and details of an entirely separate sexual assault, where this alleged victim is the reporting party, and where her own mother, to some extent, did not believe her. A jury could have failed to credit S.P.'s testimony here, not because of the content of her testimony about the events of the night in question, but because her mother did not believe her in an entirely separate and, as majority recognizes, "highly emotionally-charged" incident. I would find the court was well within its bounds here to exclude that evidence, particularly given its low probative value.

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

No. 83386-3-I/15 (DíAZ, J., dissenting)

## II.     CONCLUSION

For the foregoing reasons, I concur in part and respectfully dissent in part from the majority opinion.

Díaz, J.